# 14-2689(L)

14-2691(CON),14-2693(CON),14-2696(CON),14-2697(CON),14-2698(CON),
14-2699(CON),14-2700(CON),14-2701(CON),14-2702(CON),14-2703(CON),
14-2704(CON),14-2705(CON),14-2709(CON),14-2711(CON),14-2713(CON),
14-2714(CON),14-2715(CON),14-2718(CON),14-2722(CON),14-2723(CON),
14-2724(CON),14-2728,14-2732(CON),14-2736(CON)

## In The United States Court of Appeals
### for the Second Circuit

AURELIUS CAPITAL MASTER, LTD., AURELIUS OPPORTUNITIES FUND
II, LLC, ACP MASTER, LTD., NML CAPITAL, LTD., OLIFANT FUND, LTD.,
BLUE ANGEL CAPITAL I LLC, PABLO ALBERTO VARELA, LILA INES
BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA
LOVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ,
NORMA HAYDEE GINES, MARTZ AZUCENA VAZQUEZ,

*Plaintiffs-Appellees,*

—against—

REPUBLIC OF ARGENTINA,

*Defendant-Appellant,*

CITIBANK, N.A.,

*Movant-Interested Party-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF MOVANT-INTERESTED PARTY-APPELLANT CITIBANK, N.A.**

*Of Counsel:*

Karen E. Wagner
James L. Kerr
Matthew B. Rowland
Lindsey T. Knapp

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Movant-Interested
Party-Appellant Citibank, N.A.*

# **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

In accordance with Local Rule 26.1 and Rule 26.1 of the Federal Rules of Appellate Procedure, non-party movant Citibank, N.A. states that it is a wholly-owned, indirect subsidiary of Citigroup Inc.  Citigroup Inc. is a publicly traded company that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED ...........................................................................4

STATEMENT OF THE CASE ...............................................................5

    A.    The Republic's Default and Restructuring ...........................5

    B.    The Injunctions ...................................................................7

    C.    Citibank Argentina's Role as Custodian................................8

    D.    Payments on the Argentine Law Bonds.............................10

    E.    Citibank's Motion for Clarification....................................13

    F.    The District Court's Grant, and then Reconsideration, of Citibank's Request for Clarification....................................14

SUMMARY OF ARGUMENT ...........................................................17

STANDARD OF REVIEW ................................................................18

ARGUMENT.....................................................................................18

I.    THE CITIBANK INJUNCTION IS AN ABUSE OF DISCRETION BECAUSE IT IMPROPERLY IMPOSES OPPRESSIVE AND INEQUITABLE BURDENS ON A PARTY NOT LIABLE TO APPELLEES ...............................................................................18

    A.    The Citibank Injunction Violates Rules of Equity.............19

    B.    Citibank Argentina Cannot Be Ordered To Violate Valid Banking Laws and Regulations of Its Host Country.........22

    C.    Citibank Argentina Is Not in "Active Concert or Participation" with the Republic When It Processes Payment on the Argentine Law Bonds for Its Customers............................................25

D.      It Is Impossible To Comply With the Citibank Injunction's
        Mandate To Distinguish Between Argentine Law Bonds that
        Are Exchange Bonds and Those that Are Not ...................................26

II.     THE CITIBANK INJUNCTION IMPROPERLY RESTRAINS
        PAYMENTS TO BE MADE WHOLLY WITHIN ARGENTINA ............27

        A.      The Argentine Law Bonds Are Entirely Different from the
                Exchange Bonds that Were the Subject of the Injunctions ...............28

        B.      The Funds Being Restrained Are Not Owned by the Republic..........29

        C.      The Funds Being Restrained Are Not in the United States ...............31

        D.      Citibank Argentina Is Entitled to the Protection of the Separate
                Entity Rule ........................................................................34

III.    PRINCIPLES OF COMITY THAT SUPPORT THE ACT OF STATE
        DOCTRINE PRECLUDE APPLICATION OF THE CITIBANK
        INJUNCTION TO PAYMENTS MADE WITHIN ARGENTINA ............40

        CONCLUSION ...............................................................................46

# TABLE OF AUTHORITIES

## CASES

PAGE

*Af-Cap, Inc. v. Republic of Congo*,
    462 F.3d 417 (5th Cir. 2006) ................................................................. 41-42

*Alemite Mfg. Corp. v. Staff*,
    42 F.2d 832 (2d Cir. 1930) .............................................................17, 19-20

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
    566 F. Supp. 1440 (S.D.N.Y. 1983),
    *aff'd,* 733 F.2d 23 (2d Cir. 1984),
    *rev'd on rehearing*, 757 F.2d 516 (2d Cir. 1985) ........................... 17-18, 42-43

*Aurelius Capital Partners, LP v. Republic of Argentina*,
    No. 10-837-cv (L), slip op. (2d Cir. Mar. 24, 2010) .........................................34

*Aurelius Capital Partners, LP v. Republic of Argentina*,
    No. 07 Civ. 2715,
    2010 WL 768874 (S.D.N.Y. Mar. 5, 2010) ...............................13, 31-33, 34-35

*Ayyash v. Koleilat*,
    957 N.Y.S.2d 574 (Sup. Ct. N.Y. Cnty. 2012),
    *aff'd*, 981 N.Y.S.2d 536 (1st Dep't 2014) ...........................................37-38, 45

*Brooks v. Guiliani*,
    84 F.3d 1454 (2d Cir. 1996) ...............................................................27

*Brown v. J.P. Morgan & Co.*,
    265 A.D. 631, 40 N.Y.S.2d 229 (1st Dep't 1943),
    *aff'd*, 295 N.Y. 867 (1946) ................................................................30

*Chase Nat'l Bank v. City of Norwalk*,
    291 U.S. 431 (1934) ...............................................................26

*Cook Inc. v. Boston Scientific Corp.*,
   333 F.3d 737 (7th Cir. 2003)............................................................22

*Cronan v. Schilling*,
   100 N.Y.S.2d 474 (Sup. Ct. N.Y. Cnty. 1950),
   *aff'd*, 126 N.Y.S.2d 192 (1st Dep't 1953) ......................................35

*Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*,
   341 F.2d 50 (2d Cir. 1965)........................................................ 35-36

*EEOC v. Local 638*,
   81 F.3d 1162 (2d Cir. 1996).................................................... 20-21

*EM Ltd. v. Republic of Argentina*,
   865 F. Supp. 2d 415 (S.D.N.Y. 2012) ...........................11, 25, 29-31

*Fidelity Partners, Inc. v. First Trust Co. of N.Y.*,
   58 F. Supp. 2d 55 (S.D.N.Y. 1999),
   *aff'd*, 216 F.3d 1072 (2d Cir. 2000)................................................37

*Fidelity Partners, Inc. v.*
   *Phil. Exp. & Foreign Loan Guarantee Corp.*,
   921 F. Supp. 1113 (S.D.N.Y. 1996) ................................................36

*First Nat'l City Bank v. Banco Nacional de Cuba*,
   406 U.S. 759 (1972)........................................................................41

*Forschner Grp., Inc. v. Arrow Trading Co., Inc.*,
   124 F.3d 402 (2d Cir. 1997)............................................................27

*Gen. Bldg. Contractors Ass'n v. Penn.*,
   458 U.S. 375 (1982).......................................................... 17, 19, 20

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)........................................................................21

*Heyman v. Kline*,
   444 F.2d 65 (2d Cir. 1971)........................................................21, 26

*Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*,
    307 F. Supp. 1291 (D. Del. 1970) ............................................................. 43-44

*John Wiley & Sons, Inc. v. Kirtsaeng*,
    No. 08 Civ. 7834, 2009 WL 3003242 (S.D.N.Y. Sept. 15, 2009)....................36

*Karaha Bodas Co., LLC v.*
    *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002)................................................................................40

*Koehler v. Bank of Bermuda*,
    12 N.Y.3d 533 (2009) .....................................................................................37

*Lightwater Corp. v. Republic of Argentina*,
    No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)...........43

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)............................................................................21

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
    652 F.3d 172 (2d Cir. 2011)........................................................................... 5-6

*NML Capital, Ltd. v. Republic of Argentina*,
    727 F.3d 230 (2d Cir. 2013)..............................................................................8

*NML Capital, Ltd. v. Republic of Argentina*,
    699 F.3d 246 (2d Cir. 2012)..............................................................................7

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*,
    830 F.2d 449 (2d Cir. 1987)............................................................................45

*Pan-Am. Bank & Trust Co. v. Nat'l City Bank of N.Y.*,
    6 F.2d 762 (2d Cir. 1925)................................................................................35

*Penn. Coal Co. v. Mahon*,
    260 U.S. 393 (1922).........................................................................................21

*Regal Knitwear Co. v. NLRB*,
   324 U.S. 9 (1945)............................................................................19

*Republic of Argentina v. NML Capital, Ltd.*,
   134 S. Ct. 2819 (June 16, 2014) (No. 13-990).............................8, 13

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
   91 F.3d 914 (7th Cir. 1996)...........................................................26

*Rosario-Urdaz v. Rivera-Hernandez*,
   350 F.3d 219 (1st Cir. 2003) .........................................................18

*Schooner Exchange v. McFadden*,
   11 U.S. (7 Cranch) 116 (1812) ................................................. 40-41

*In re Sealed Case*,
   825 F.2d 494 (D.C. Cir. 1987) ......................................................23

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
   No. 98 Civ. 5951, 2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ................35, 37

*Shakhnes v. Berlin*,
   689 F.3d 244 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1808 (2013)..................19

*In re Sims*,
   534 F.3d 117 (2d Cir. 2008)..........................................................18

*Tire Eng'g & Distribution L.L.C. v. Bank of China Ltd.*,
   740 F.3d 108 (2d Cir. Jan. 14, 2014)...............................................37

*Trinh v. Citibank, N.A.*,
   850 F.2d 1164 (6th Cir. 1988) .......................................................38

*Trugman-Nash, Inc. v. N.Z. Dairy Bd.*,
   954 F. Supp. 733 (S.D.N.Y. 1997)..................................................44

*Underhill v. Hernandez*,
   168 U.S. 250 (1897)....................................................................41

*United States v. First Nat'l Bank of Chi.*,
   699 F.2d 341 (7th Cir. 1983)...............................................................23

*United States v. First Nat'l City Bank*,
   379 U.S. 378 (1965)...........................................................................23

*United States v. Javino*,
   960 F.2d 1137 (2d Cir. 1992).............................................................41

*United States v. Pink*,
   315 U.S. 203 (1942)...........................................................................40

*United States v. Watchmakers of Switz. Info. Ctr., Inc.*,
   No. 96-170, 1962 U.S. Dist. LEXIS 5816,
   1963 Trade Cases (CCH) ¶ 70,600 (S.D.N.Y. Dec. 20, 1962)..........................44

*United States v. Zang*,
   703 F.2d 1186 (10th Cir. 1982).........................................................22

*Vacco v. Operation Rescue Nat'l*,
   80 F.3d 64 (2d Cir. 1996)...................................................................21

*In re Vitamin C Antitrust Litig.*,
   584 F. Supp. 2d 546 (E.D.N.Y. 2008)..............................................43

*Wells Fargo Asia, Ltd., v. Citibank, N.A.*,
   936 F.2d 723 (2d Cir. 1991)..............................................................38

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990)...........................................................................41

## S<span></span>TATUTES & R<span></span>ULES

12 U.S.C. § 601 ......................................................................................35

12 U.S.C. § 633 ......................................................................................39

28 U.S.C. § 1291 ........................................................................................... 4

28 U.S.C. § 1292(a)(1) ................................................................................. 4

28 U.S.C. § 1330 ........................................................................................... 4

28 U.S.C. § 1605(a)(1) ................................................................................. 4

28 U.S.C. § 1610(a) .......................................................................... 31, 32, 33

28 U.S.C. § 1610(d) .................................................................................... 33

CPLR § 5225 ................................................................................................ 37

CPLR § 5227 ................................................................................................ 37

Fed. R. Civ. P. 65(d)(2)(C) ........................................................................ 25

N.Y. Banking Law § 134(4) ....................................................................... 23

N.Y. Banking Law § 134(5) ....................................................................... 23

N.Y. Banking Law § 138(1) ....................................................................... 38

NYUCC art. 4-A .......................................................................................... 35

NYUCC art. 5 ............................................................................................... 35

NYUCC art. 8 ............................................................................................... 36

NYUCC § 1-105(2) ..................................................................................... 23

NYUCC § 4-102(2) ..................................................................................... 23

NYUCC § 4-A-105(1)(b) ........................................................................... 35

NYUCC § 5-116(b) ..................................................................................... 35

NYUCC § 8-110(e) .................................................................................36

NYUCC § 8-112(c) .................................................................................36

NYUCC § 9-304 .....................................................................................36

O<small>THER</small> A<small>UTHORITIES</small>

Hague Securities Convention, art. 4, *available at*
    http://www.hcch.net/index_en.php?act=conventions.text&cid=72 ..................37

Letter from N.Y. State Sen. Hugh T. Farley to Elizabeth D. Moore,
    Legislative Sec'y to Gov. Mario Cuomo (July 1, 1994) ........................... 38-39

Restatement (Second) of Contracts § 364(1)(b) (1981) .........................................21

Restatement (Third) of the Foreign Relations Law
    of the United States § 402 (1987).....................................................41

Restatement (Third) of the Foreign Relations Law
    of the United States § 402(1)(b) (1987).............................................31

Restatement (Third) of the Foreign Relations Law
    of the United States § 403 (1987).....................................................41

Restatement (Third) of the Foreign Relations Law
    of the United States § 403(2) (1987) .............................................41, 44

Restatement (Third) of the Foreign Relations Law
    of the United States § 403(3) (1987) .................................................44

Restatement (Third) of the Foreign Relations Law
    of the United States § 441(1) (1987) .................................................44

# PRELIMINARY STATEMENT

Non-Party Citibank, N.A. ("Citibank") appeals from the order of the United States District Court for the Southern District of New York (Griesa, J.) entered on July 28, 2014 (the "Citibank Injunction") (SPA-1–4).[1]  The Citibank Injunction enjoins Citibank's Argentine branch ("Citibank Argentina")—an entity subject to Argentine jurisdiction, law, and regulation—from making payments to its customers on certain bonds issued by the Republic of Argentina that are governed by Argentine law and payable in Argentina in U.S. Dollars through a local Argentine clearinghouse and depositary (the "Argentine Law Bonds").

The Citibank Injunction reversed an order issued a month earlier, which clarified that the sweeping injunctions the District Court had entered on November 21, 2012 (the "Injunctions") "*do not as a matter of law* prohibit payments by [Citibank Argentina] on [the Argentine Law Bonds]" (the "Citibank Clarification Order").  (SPA-5–6) (emphasis added).[2]  The Injunctions were intended to force the Republic to make payments to Appellees, the holders of debt on which the Republic had defaulted in 2001, if it made payments to holders of certain bonds

---

[1] "A-" refers to pages of the Joint Appendix, filed August 15, 2014.  "SPA-" refers to pages of the Special Appendix, filed August 15, 2014.

[2] The Citibank Clarification Order applied to both U.S. Dollar-denominated and Peso-denominated bonds; the Citibank Injunction reversed the prior order only with respect to the U.S. Dollar-denominated bonds.  (SPA-3).  Payments on Peso-denominated bonds are not enjoined.  (SPA-3).

issued in exchange for defaulted debt in 2005 and 2010 (the "Exchange Bonds"). *See* Dec. 7, 2011 Order (A-1277–81); Injunctions (A-1459–66).

On June 18, 2014, after the Supreme Court denied the Republic's petition for certiorari and this Court lifted its stay, the Injunctions became effective. The Republic defied the Injunctions when, at the end of June, it paid more than $500 million on the Exchange Bonds without paying Appellees—and it has said that it will do so again.

The next interest payment on some of the Argentine Law Bonds is due on September 30. If their holdings remain the same, Citibank Argentina expects to receive approximately $5 million for its customers. Under Argentine law, Citibank Argentina must credit that payment to its customers or risk grave sanctions. The Republic has demanded that Citibank Argentina honor this obligation. *See* Letter from K. Wagner to C. O'Hagan Wolfe, dated Aug. 13, 2014 ("Supp. Auth. Letter") (A-2203–13). But the Citibank Injunction directs Citibank Argentina to violate both its obligations to customers and Argentine banking law.

Citibank cannot comply with both of these directives—one from a United States court and one from the sovereign state in which its branch operates. The jeopardy into which Citibank has suddenly been placed was not generated by a clash between the banking laws of the United States and Argentina. As relevant

here, those laws are the same.  In both countries, banks must honor their contracts with customers, and must credit customers with funds received on their behalf.

The causes of that jeopardy are instead three unprecedented, and unanticipated, events:

- First, the issuance of mandatory, but unenforceable, injunctions against a sovereign;

- Second, the sovereign's decision not to obey those injunctions;

- And third, the District Court's order that Citibank Argentina violate the banking laws of Argentina and its contracts with its customers.

It is increasingly apparent that the mandatory payment injunctions directed to the Republic cannot be enforced.  And the Citibank Injunction will neither cause the Republic to comply, nor punish the Republic for its failure to do so.  The Citibank Injunction will only put Citibank Argentina, a non-party that has no liability to Appellees, and that is uniquely subject to the laws and dictates of the Republic, in an untenable, and extremely dangerous, position—which could lead to consequences as serious as the loss of Citibank Argentina's banking license and its takeover by the Republic.

The Citibank Injunction is an abuse of the District Court's discretion.  It was issued in disregard of both controlling legal principles, and an undisputed and dispositive factual record.  Therefore, the Citibank Injunction must be reversed

forthwith, and the Citibank Clarification Order, which properly excluded Citibank from the scope of the Injunctions, must be reinstated.

## JURISDICTIONAL STATEMENT

The District Court originally had jurisdiction over this action under the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1330, 1605(a)(1). Citibank filed timely notices of appeal of the Citibank Injunction on July 29, 2014. This Court has appellate jurisdiction to review the Citibank Injunction pursuant to 28 U.S.C. §§ 1291, 1292(a)(1).

## ISSUES PRESENTED

1. Did the District Court abuse its discretion when, on reconsideration of the Citibank Clarification Order permitting payment on the Argentine Law Bonds, it instead issued the Citibank Injunction, restraining the payment of funds to customers in Argentina on the U.S. Dollar-denominated Argentine Law Bonds, which are entirely different from the bonds that had been before the District Court when it issued the Injunctions, and which are governed by Argentine law and payable wholly within Argentina, pursuant to a custody arrangement subject to Argentine law and regulation?

2. Did the District Court abuse its discretion when it issued the Citibank Injunction, thereby exposing Citibank Argentina, a branch bank subject to the laws and penal force of the Republic, to grave and undisputed risk of Argentine regulatory and criminal sanctions, as well as civil liability, and imposing an extreme and inequitable burden upon Citibank Argentina well beyond the "minor and ancillary" relief permitted against a non-party?

3. Did the District Court abuse its discretion by disregarding principles of comity that support the act of state doctrine and the defense of foreign compulsion when it issued the Citibank Injunction, which interferes with the sovereign acts of the Republic taken wholly within its own jurisdiction, and requires Citibank Argentina to take actions in Argentina in violation of Argentine law?

4

4. Did the District Court abuse its discretion when it issued the Citibank Injunction by restraining payments on bond instruments that are not Exchange Bonds but cannot be differentiated from Exchange Bonds, thereby vastly increasing the scope of the Injunctions, in the face of uncontroverted evidence that compliance would be "operationally impossible"?

## STATEMENT OF THE CASE

This appeal arises from the imposition by the District Court (Griesa, J.) on Citibank Argentina of sweeping Injunctions designed to force the Republic to pay Appellees if it pays holders of Exchange Bonds. *See* Citibank Injunction (SPA-4). The Republic has defied the Injunctions, and has made interest payments on its Exchange Bonds without paying Appellees. The Republic has not and will not comply with the Injunctions, which has caused chaos. When the Republic pays, Citibank Argentina will be in possession of customer funds that it must pay to its clients. But the Citibank Injunction directs Citibank Argentina to violate the law and its contractual custody account obligations. Citibank Argentina, as an Argentine branch of a U.S. financial institution, is uniquely vulnerable to regulatory and criminal sanctions and civil liability in Argentina—placing it uniquely at risk. The Citibank Injunction is an unlawful abuse of discretion, and must be reversed.

### A.     The Republic's Default and Restructuring

This litigation began with Argentina's 2001 default on its external public debt. *See NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d

172, 175–78 (2d Cir. 2011) (providing background). In 2005 and 2010, the

Republic offered holders of its defaulted debt the option to exchange their bonds

for new bonds with different terms, the Exchange Bonds. Through this process,

the Republic restructured approximately $80 billion of its debt, resulting in the

exchange of approximately 92 percent of Argentina's defaulted debt. *Id.* at 176

n.4.

The Exchange Bonds include U.S. Dollar-denominated and Euro-

denominated bonds, governed by New York or English law, and issued under a

trust indenture (the "Indenture") governed by New York law executed between the

Republic and The Bank of New York Mellon ("BNY Mellon") as U.S.-European

trustee. (A-652–824, at A-722).

The Argentine Law Bonds, some of which are also Exchange Bonds, were

not issued under the Indenture. Instead, they were issued under two Argentine

government decrees, one dated December 9, 2004 and the second dated April 26,

2010. *See* Declaration of Maximiliano D'Auro, dated May 21, 2013 ("D'Auro

Decl.") Exs. A–D (decrees in Spanish and in English) (A-1492–1524). Payments

on the Argentine Law Bonds are not made through BNY Mellon, but instead are

made entirely in Argentina as further detailed below. Interest payments on the

Argentine Law Bonds are due every quarter (March 31 and September 30 for Par

Bonds, and June 30 and December 31 for Discount Bonds). *See* D'Auro Decl.

6

Exs. E–F (A-1525–1779).  The next interest payment on the Argentine Law Bonds is due on September 30, 2014.

## B.     The Injunctions

In December 2011, in litigation to which Citibank was not a party, the District Court issued an unprecedented ruling, holding that a provision governing some of Argentina's bonds, the *pari passu* clause, obligated Argentina to make ratable payments on defaulted debt when it made any payment on its Exchange Bonds.  *See* Order (A-1277–81, at 1280–81).  The Court also issued mandatory injunctions enforcing Argentina's contractual payment obligations, and parallel injunctions prohibiting non-party financial institutions from making payments on Exchange Bonds if Appellees were not paid as well.  *See* Order (order granting injunctions) (A-1340–45).

In October 2012, this Court upheld both the *pari passu* decision and the unprecedented injunctive relief, but asked the District Court to clarify the "ratable payment" formula and the impact of the injunctions on third-party financial institutions.  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 265 (2d Cir. 2012).  On November 21, 2012, the District Court issued a responsive opinion and the Injunctions.  *See* Opinion (A-1441–52).  In its opinion, the District Court directed the Republic to "pay plaintiffs approximately $1.33 billion" when it made the next interest payment on the Exchange Bonds.  (A-1444).  The District Court

also held that any non-party financial entity on notice of the Injunctions was bound under Rule 65 of the Federal Rules of Civil Procedure, ruling—without any fact-finding—that all such institutions were "'in active concert or participation' with Argentina in processing the payments from Argentina to the exchange bondholders." (A-1450–51).

The Injunctions were affirmed by this Court on August 23, 2013, *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013), and the Supreme Court denied the Republic's petition for certiorari on June 16, 2014, *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (June 16, 2014) (No. 13-990). The denial of certiorari caused a stay of enforcement of the Injunctions to expire.

### C.    Citibank Argentina's Role as Custodian

The role of Citibank Argentina is entirely distinct from the role of BNY Mellon or any of the other entities named in the Injunctions. No evidence about either the Argentine Law Bonds or the role of Citibank Argentina as custodian holding Argentine Law Bonds for customers was put before the District Court in the litigation leading to issuance of the Injunctions.

Citibank Argentina is a branch of Citibank located in Buenos Aires, Argentina and is licensed by the Central Bank of Argentina (the "BCRA"). Citibank Argentina must obey the banking laws of Argentina and the rules and

regulations of the BCRA, which supervises the banking activities of financial institutions within Argentina, including those relating to the provision of custodial services.  *See* D'Auro Decl. ¶¶ 13–15 (A-1488–85).

Citibank Argentina maintains custody accounts for customers in Argentina, pursuant to agreements that require Citibank Argentina to act solely for its custody account customers.  *See* Declaration of Federico Elewaut, dated May 22, 2013 ("Elewaut Decl.") ¶ 4 (A-1475–79, at A-1476); D'Auro Decl. ¶ 12 (A-1488).  Citibank Argentina does not act for the Republic when receiving or making payments in connection with its custody accounts.  Some of Citibank Argentina's custody account customers hold Argentine Law Bonds in their accounts.

Argentine law requires Citibank Argentina to credit the accounts of its customers when it receives payment on instruments it holds for them in custody, including the Argentine Law Bonds.  If it does not do so, it will be subject to grave risk of regulatory and criminal sanctions, as well as civil liability.  And, as a general principle, the Argentine legal system does not recognize as enforceable the acts of foreign courts.  D'Auro Decl. ¶ 16 (A-1489).  Therefore, were Citibank Argentina to act in violation of Argentine law in order to comply with an order of a foreign court (including the District Court), that order would provide no shield.

As a civil matter, the unilateral withholding of any funds received by Citibank Argentina for its customers could expose Citibank Argentina to claims of

breach of contract, *id*. ¶ 20 (A-1490), and the BCRA could conclude that Citibank Argentina had violated the Financial Institutions Act, and impose serious administrative sanctions, including taking over the bank, *see id.* ¶ 21 (A-1490). In the criminal context, the unilateral withholding or disposal of the funds contrary to instructions of Citibank Argentina's custody account customers might be deemed to be either "unjustified retention" or "fraudulent administration" of a third party's assets, an offense under the Argentine Criminal Code that could expose participating bank officials to imprisonment. Declaration of Manuel Beccar Varela, dated May 21, 2013 ¶ 4 (A-1482).

### D.     Payments on the Argentine Law Bonds

The payment flow on the Argentine Law Bonds held for customers of Citibank Argentina is entirely different from the payment flow for the Exchange Bonds, because payment on the Argentine Law Bonds takes place entirely in Argentina. The Republic first transfers funds to the account of the Central de Registro y Liquidación de Instrumentos de Endeudamiento Publico (the "CRYL") with the BCRA. The CRYL, which has no branches or employees in New York, is a registry for the registration, clearance, and settlement of transactions involving debt securities issued by the Republic. *See* Elewaut Decl. ¶ 6 (A-1477); D'Auro Decl. ¶ 6 (A-1486).

Immediately upon receiving a payment from the Republic, the CRYL transfers an equal sum to the Caja de Valores S.A. (the "Caja"), an Argentine institution that acts as a securities depository, registrar, and paying agent for both government and corporate securities, and holds "collective deposits" in the names of participating institutions and their customers.[3] *See* Elewaut Decl. ¶ 7 (A-1477); D'Auro Decl. ¶ 7 (A-1486); *see also EM Ltd. v. Republic of Argentina*, 865 F. Supp. 2d 415, 419 (S.D.N.Y. 2012) (Caja is the "counterpart of the Depository Trust Company in the United States").

The Caja in turn debits its account with the BCRA in an amount equal to the sum due to those who hold Argentine Law Bonds through local custody accounts, in this case accounts maintained with Citibank Argentina, and simultaneously credits that amount to the respective accounts of Citibank Argentina and other custodians for the Argentine Law Bonds with the BCRA. *See* Elewaut Decl. ¶ 8 (A-1477); D'Auro Decl. ¶ 8 (A-1487).

Once the Caja receives payment from the CRYL and deposits the payment in the account of Citibank Argentina at the BCRA, the payment to holders of Argentine Law Bonds is complete pursuant to the terms of the Argentine Law

---

[3] Citibank Argentina is not the exclusive custodian for holders of Argentine Law Bonds. Other financial institutions with accounts at the Caja provide this service to other holders of Argentine Law Bonds.

Bonds and Argentine law.[4]  *See* D'Auro Decl. ¶ 10 (A-1487–88).  Consequently, any payment received by Citibank Argentina is customer property.  *See id.* (A-1487–88).

Immediately upon the receipt of payment on the Argentine Law Bonds in its account with the BCRA, Citibank Argentina credits the custody account of each of its customers in Buenos Aires, who are then legally entitled to withdraw those amounts.  *See* Elewaut Decl. ¶ 10 (A-1478); D'Auro Decl. ¶ 11 (A-1488).  Citibank Argentina's obligation to its custody account customers is complete when the cash accounts of those customers have been credited with the amount each such customer is entitled to receive on that date, and when any instructions in respect of such accounts have been carried out.  *See* Elewaut Decl. ¶ 12 (A-1478); D'Auro Decl. ¶ 12 (A-1488).

---

[4] Citibank Argentina, as a participating financial institution in the Caja, has entered into a collective deposit agreement with the Caja pursuant to which Citibank Argentina is deemed to have delivered to the Caja a specific amount of securities for the account of its customers that the Caja holds in a "collective deposit," with a commitment by the Caja to return the same number and type of securities to Citibank Argentina and its customers.  *See* Elewaut Decl. ¶ 9 (A-1477–78); D'Auro Decl. ¶ 9 (A-1487).  The deposit of securities with the Caja is made in the name of both the participating financial institution (*e.g.*, a bank like Citibank Argentina) and such institution's custody account customer or customers.  *See id.* (A-1477–78, 1487).

### E.    Citibank's Motion for Clarification

Given the significant legal and factual differences between the bonds subject to the Injunctions and the Argentine Law Bonds, Citibank did not believe the Injunctions were intended to apply, or properly could apply, to payments by Citibank Argentina on the Argentine Law Bonds. Indeed, in a similar case, the District Court ruled that property in Argentina could not be restrained. *Aurelius Capital Partners, LP v. Republic of Argentina* ("*ANSES*"), No. 07 Civ. 2715, 2010 WL 768874 (S.D.N.Y. Mar. 5, 2010). However, because the Injunctions were broadly worded to apply to "Exchange Bonds" (A-1462), and because Citibank understood then that the Argentine Law Bonds it held for customers were Exchange Bonds, Citibank in May 2013 moved for clarification that the Injunctions did not apply to its payments on the Argentine Law Bonds.

The District Court denied Citibank's initial motion due to the pendency of appeals of the Injunctions. After the Supreme Court denied the Republic's petition for certiorari from this Court's order affirming the Injunctions, see *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (June 16, 2014) (No. 13-990), the order staying the Injunctions was lifted shortly before the June 30 payment date on the Exchange Bonds, and Citibank urgently renewed its motion.

Citibank argued, *first*, that as a matter of law restraints may not be imposed on payments of funds, not owned by the Republic, that are to be made entirely in

13

Argentina on bonds subject to Argentine law through accounts subject to Argentine law and regulation; *second*, that because the *situs* of these payments is Argentina for act of state purposes, the Injunctions would contravene the act of state doctrine if applied to payments on the Argentine Law Bonds; and *third*, that because applying the Injunctions to the Argentine Law Bonds would expose Citibank Argentina to grave regulatory and criminal sanctions and civil liability in Argentina, imposing such an extreme and inequitable burden upon Citibank Argentina was unlawful because it went well beyond the "minor and ancillary" relief permitted in equity jurisprudence against a non-party.

### F.    The District Court's Grant, and then Reconsideration, of Citibank's Request for Clarification

The District Court granted Citibank's motion on June 27, issuing the Citibank Clarification Order, excluding Citibank from the scope of the Injunctions. In the Citibank Clarification Order, the District Court "CLARIFIED that [the Injunctions] do not as a matter of law prohibit payments by [Citibank Argentina] on [the Argentine Law Bonds]."  Citibank Clarification Order (SPA-6).

The Republic, defying the Injunctions, had by then made the payments due on June 30 on the Exchange Bonds and other debt, but not on defaulted debt held by Appellees.  Upon issuance of the Citibank Clarification Order, Citibank

14

Argentina made the payments due to its customers, as permitted by the Citibank Clarification Order and as mandated by Argentine law.

Appellees then filed a motion for reconsideration, arguing that the District Court might have overlooked the fact that the Argentine Law Bonds were Exchange Bonds, as broadly defined by the Injunctions. Citibank responded that this could not have been overlooked, noting that it was the very reason clarification had been sought, and raised all of the arguments already made in support of the Citibank Clarification Order. At a hearing on July 22, 2014, the District Court failed to address any of Citibank's arguments, and indeed seemed surprised that the Argentine Law Bonds could be Exchange Bonds. The District Court instead asked about the proportion of the Argentine Law Bonds relative to all Exchange Bonds, and reserved decision until that information was provided. July 22, 2014 Hr'g Tr. at 13:4–5, 14:9–11, 25:3–6 (A-2130, 2131, 2142).

The day after the hearing, Citibank discovered—and immediately informed the Court—that some Argentine Law Bonds are not Exchange Bonds at all, and that these non-Exchange Bonds are fungible with and indistinguishable from the Argentine Law Bonds that are Exchange Bonds.[5] *See* Letter from Karen E.

---

[5] Many of the Argentine Law Bonds were issued under the same Argentine decrees as the minority of Argentine Law Bonds that are Exchange Bonds, and with the same International Securities Identification Numbers ("ISINs"), but not in connection with any Exchange Offer. *See*  Letter from Karen E. Wagner to Hon.

Wagner to Hon. Thomas P. Griesa, dated July 23, 2014 (A-2174–76).  The

Republic, which as issuer is uniquely situated to have information about these

bonds, confirmed that more than two-thirds of the Argentine Law Bonds are not

Exchange Bonds, and that they are indistinguishable from those that are.  *See*

Letter from Carmine D. Boccuzzi, Jr. to Hon. Thomas P. Griesa, dated July 27,

2014 ("Boccuzzi Letter"), at 2 & n.2 (A-2180–81, at A-2181).  Plaintiffs conceded

that it was impossible for Citibank and other financial institutions who process

payments to distinguish those Argentine Law Bonds that are Exchange Bonds from

those that are not.  Letter from E. Friedman to Hon. Thomas P. Griesa, dated July

27, 2014, at 4 (A-2182–85, at A-2185).  None of this information had previously

been elicited in the process leading to issuance of the Injunctions.

Inexplicably, the District Court nevertheless issued the Citibank Injunction,

enjoining payments by Citibank Argentina on Argentine Law Bonds that are

Exchange Bonds, and requiring the parties to "devise a way to distinguish"

between those Argentine Law Bonds that are Exchange Bonds and those that are

---

Thomas P. Griesa, dated July 23, 2014 (A-2175).  Because all bonds issued with
the same ISIN are fungible, it is not possible to tell which Argentine Law Bonds
are, and which are not, Exchange Bonds.  *Id.* (A-2175–76); *see also* Declaration of
Federico Elewaut, dated July 28, 2014 ("Suppl. Elewaut Decl.") ¶ 4 (A-2190–92).

The Republic has since clarified its view that none of the Argentine Law
Bonds should properly be considered to be Exchange Bonds because of their
unique characteristics.  The Republic has also appealed from the Citibank
Injunction, and Citibank joins in the arguments of the Republic on this point.

not—despite uncontroverted evidence that doing so is "operationally impossible." *See* Citibank Injunction at 4 (SPA-4); Suppl. Elewaut Decl. ¶ 4 (A-2192).

## SUMMARY OF ARGUMENT

The Citibank Injunction is an abuse of discretion that must be reversed before the next payment is made by the Republic.

*First*, the Citibank Injunction exposes Citibank Argentina to grave regulatory and criminal sanctions, as well as civil liability.  This risk is an oppressive and inequitable burden upon a non-party, well beyond any "minor and ancillary" relief that might properly be imposed pursuant to Federal Rule of Civil Procedure 65(d) or permitted by equity jurisprudence.  *Gen. Bldg. Contractors Ass'n v. Penn*, 458 U.S. 375, 399–402 (1982); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930).

*Second*, the Citibank Injunction cannot properly expand the Injunctions to restrain payments in Argentina on the Argentine Law Bonds, particularly those that are not Exchange Bonds, thereby forcing Citibank Argentina—an entity subject to the laws, regulation, and directives of the Republic—to violate Argentine banking law that is entirely consistent with U.S. banking law.

*Third*, any such restraint would contravene the act of state doctrine, as authoritatively construed by the this Court in *Allied Bank International v. Banco*

*Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), and the related defense of foreign sovereign compulsion.

## STANDARD OF REVIEW

This Court reviews the Citibank Injunction for abuse of discretion arising from "an erroneous view of the law or on a clearly erroneous assessment of the evidence, or [from] render[ing] a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (citation and internal quotation marks omitted); *cf. Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003) ("[A]n abuse of discretion [also] occurs when the district court considers improper criteria, ignores criteria that deserve significant weight, or gauges only the appropriate criteria but makes a clear error of judgment in assaying them." ).

## ARGUMENT

## I.  THE CITIBANK INJUNCTION IS AN ABUSE OF DISCRETION BECAUSE IT IMPROPERLY IMPOSES OPPRESSIVE AND INEQUITABLE BURDENS ON A PARTY NOT LIABLE TO APPELLEES

Appellees have no claim against Citibank; they have only a right to specific performance by the Republic.  The Republic has refused to obey the Injunctions that were issued to enforce that specific performance payment obligation, and the Injunctions cannot be enforced against a sovereign state.  The central purpose of

the Injunctions has therefore failed.  Under any circumstances, issuing an order forcing Citibank Argentina to violate applicable banking law of its host country would be an abuse of discretion.  Under *these* circumstances, where Citibank Argentina is subject to the laws and directives of the Republic, and where the Injunctions cannot be enforced against their target, the Citibank Injunction is entirely unjustified.

### A.    The Citibank Injunction Violates Rules of Equity

The Supreme Court has recognized "fundamental limitations on the remedial powers of the federal courts," which permit their exercise "only on the basis of a violation of the law."  *Gen. Bldg. Contractors*, 458 U.S. at 399.  A non-party's lawful conduct that is "independent" of a party's wrongful conduct falls outside the scope of a federal court's injunctive power.  *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945) (injunctive power is not "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law"); *Shakhnes v. Berlin*, 689 F.3d 244, 257 (2d Cir. 2012) ("[a]n injunction is overbroad when it restrains . . . legal conduct"), *cert. denied*, 133 S. Ct. 1808 (2013).  As Judge Learned Hand stated over eighty years ago:

> [N]o court can make a decree which will bind anyone but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.  If it assumes to do so, the decree is *pro tanto brutum fulmen*, and the persons enjoined are free to ignore it.

*Alemite Mfg.*, 42 F.2d at 832.

In *General Building Contractors*, the Supreme Court elaborated on the principle that a court may not "lawfully enjoin the world at large." There, certain defendants were found liable for racial discrimination and were enjoined from taking further discriminatory actions. 458 U.S. at 378. Other defendants, not found liable, were also enjoined. The Supreme Court held that the imposition of a remedial injunction in the absence of liability was impermissible. *Id.* at 399–402. In doing so, the Court first recognized "fundamental limitations on the remedial powers of the federal courts," and concluded that there was "no support for the imposition of injunctive relief against a party found not to have violated any substantive right of respondents." *Id.* at 399. Non-liable parties might be subjected only to "minor and ancillary relief" that is "not the same, and cannot be the same, as that awarded against a party found to have infringed the statutory rights of persons in the position of respondents." *Id.*

A remedy that treated non-parties "as if they had been properly found liable . . . is beyond the traditional equitable limitations upon the authority of a federal court to formulate such decrees . . . [and] such obligations can be imposed neither under traditional equitable authority of the District Court nor under the All Writs Act." *Id.* at 400–02; *see also EEOC v. Local 638*, 81 F.3d 1162, 1180 (2d

20

Cir. 1996) ("If the plaintiffs wish to have sanctions imposed on the Contractors or to fashion remedies as to them that are more than minor and ancillary, they may do so only upon establishing the Contractors' liability after adhering to the appropriate rules of civil procedure."); *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("Rule 65(d) codifies the well-established principle that, in exercising its equitable powers, a court cannot lawfully enjoin the world at large." (internal quotation marks omitted)); *Heyman v. Kline*, 444 F.2d 65, 65–66 (2d Cir. 1971) ("Rule 65(d) does not grant a court power so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." (internal quotation marks omitted)); *cf. Penn. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) (Holmes, J.) ("In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders.").

Equitable jurisdiction is not so "expansive" as to create a general power to grant relief whenever legal remedies are not "practical and efficient." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321 (1999). Indeed, it is a well-understood principle that equitable relief will be denied where it would impose extreme burdens on non-parties. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (citing Restatement (Second) of Contracts § 364(1)(b) (1981) ("Specific performance or

21

an injunction will be refused if such relief would be unfair because . . . (b) the relief would cause unreasonable hardship or loss to . . . third persons.")); *Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 744 (7th Cir. 2003) (modifying injunction in contract case because it "violate[d] the principle that in determining the appropriate scope of an injunction the judge must give due weight to the injunction's possible effect on innocent third parties"); *cf. United States v. Zang*, 703 F.2d 1186, 1195 (10th Cir. 1982) ("[T]he interests of innocent third parties should be protected.").

## B.    Citibank Argentina Cannot Be Ordered To Violate Valid Banking Laws and Regulations of Its Host Country

Citibank Argentina is a non-party, not liable to Appellees, upon whom the burden of being subjected to the Injunctions is unique.  Citibank Argentina is bound to obey the banking laws of Argentina.  There is no dispute that the laws of Argentina, exactly like the laws of the United States, require that Citibank Argentina credit its customers' accounts with payments it receives on their behalf as custodian.  And there is no dispute that Appellees have not gone through the required procedure under Argentine law to enforce the Injunctions in Argentina.  Accordingly, enjoining Citibank Argentina from transferring customer property to

customers pursuant to mandatory Argentine law is unlawful.[6]  *See, e.g.*, *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) (cautioning that "overseas transactions are often caught in a web of extraterritorial activities and foreign law beyond the ken of our federal courts or their competence" and citing as examples injunctions that "would violate foreign law . . . or place respondent under any risk of double liability"); *see also In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (holding that it was error for a district court to issue a contempt order compelling "a foreign [bank] to violate the laws of a different foreign sovereign on that sovereign's own territory," especially where the foreign bank was "a third party that has not been accused of any wrongdoing"); *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345–46 (7th Cir. 1983) (finding that it was an abuse of discretion for the district court to enter a discovery order compelling production against a foreign bank branch and its foreign employees where they

---

[6] New York banking law is no different in this regard.  Pursuant to Sections 134(4) and (5) of the New York Banking Law, a New York bank need not give effect to a claim of authority or adverse claim to an account unless the party seeking to assert the adverse claim or control disposition of the account obtains a "restraining order, injunction or other appropriate process . . . from a court of competent jurisdiction in the United States," or executes a bond in favor of the bank satisfactory to it.  This territorial principle is further confirmed by the mandatory choice of law rules for bank deposits found in New York's Uniform Commercial Code (the "NYUCC"), which place territorial limits on the ability of parties to choose a law to govern a deposit account other than the law of the separate office of the bank where the account is maintained.  *See* NYUCC §§ 1-105(2), 4-102(2).

would be "exposed to criminal liability" in the foreign country, and where the bank was a non-party).

Here, the Citibank Injunction is not based on a conclusion that the banking laws of the United States and Argentina are incompatible and that Citibank Argentina cannot comply with both. On the contrary, the Citibank Injunction directs Citibank Argentina to violate Argentine law that is consistent with U.S. law solely because the Republic has refused to obey the unprecedented and unenforceable Injunctions issued by the District Court.

But putting Citibank Argentina at extreme risk by ordering it to violate Argentine law will not cause the Republic to obey. On the contrary, the Republic likely will continue to defy the Injunctions no matter what Citibank does—indeed, it has repeatedly said that it intends to continue to pay all debt other than defaulted debt. Only Citibank Argentina and its customers, who have no liability to Appellees, will be punished. The Citibank Injunction therefore serves no valid or legal objective, and fundamental principles of law and equity therefore demand that it be reversed as a grievous abuse of discretion by a judge who ignored both the evidence before him and the legal consequences of that evidence.

**C.    Citibank Argentina Is Not in "Active Concert or Participation" with the Republic When It Processes Payment on the Argentine Law Bonds for Its Customers**

Here, the Injunctions specifically bind non-party "Participants"—*i.e.*, "those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds." Injunctions ¶¶ 2(e), (f) (A-1463–64). In the Citibank Injunction, the District Court went further to hold that the Injunctions apply to Citibank Argentina's future payments to customers, apparently on the basis of Rule 65.

But the facts make manifest that Citibank Argentina is not "in active concert or participation" with the Republic. Fed. R. Civ. P. 65(d)(2)(C). Citibank Argentina does not "assist the Republic in fulfilling its payment obligations under the Exchange Bonds." Injunctions ¶ 2(f) (A-1463). The Republic's payment obligations are complete once the Caja receives payment from the CRYL, and deposits the payment in the account of Citibank Argentina at the BCRA. D'Auro Decl. ¶ 10 (A-1487–88). Once the Republic transfers funds to the CRYL, it loses control of the funds and they become customer property—*before* they reach Citibank Argentina. *See, e.g.*, 2005 Prospectus Supplement at S-67, S-73 (A-728, 734); *see also EM Ltd.*, 865 F. Supp. 2d at 423–24. No entity in the payment chain before Citibank Argentina is subject to U.S. jurisdiction.

Therefore, when the Republic makes the next scheduled payment, as it surely will, Citibank Argentina will be required, by Argentine law and sovereign directive, to pay its customers—exactly as it would be required to do if it received payments for customers in the United States.  A bank that obeys banking law is not acting "in concert" with the Republic or "aid[ing] or abet[ting] the [Republic] in a concerted attempt to subvert" the "proscriptions" of the Injunctions.  *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 919 (7th Cir. 1996); *see also Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 437 (1934) (it would violate established principles of equity jurisdiction to enforce an injunction against persons acting not as "associates or confederates" of the defendant but solely in the performance of their "official duty"); *Heyman*, 444 F.2d at 65–66 (Rule 65(d) does not authorize jurisdiction over non-parties who act independently).  As a result, the Injunctions cannot properly as a matter of law bind Citibank Argentina.

### D.     It Is Impossible To Comply With the Citibank Injunction's Mandate To Distinguish Between Argentine Law Bonds that Are Exchange Bonds and Those that Are Not

In the Citibank Injunction, the District Court recognized that "Citibank cannot distinguish between [Argentine Law Bonds that are not Exchange Bonds] and [Exchange Bonds]."  Citibank Injunction (SPA-3).  The Court nevertheless directed the parties to do the impossible—"to devise a way to distinguish" between these indistinguishable bonds.  *Id.* (SPA-4).  Citibank is unaware of any way to

comply with the Court's directive.  As a result, the Citibank Injunction effectively enjoins Citibank Argentina from making payment on *all* Argentine Law Bonds, including those that are not Exchange Bonds, yet another reason to reverse the Citibank Injunction.  *See Forschner Grp., Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) ("[T]he essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation . . . and to mould each decree to the necessities of the particular case." (internal citations omitted)); *Brooks v. Guiliani*, 84 F.3d 1454, 1467 (2d Cir. 1996) ("Injunctive relief should be 'narrowly tailored' to address specific harms and 'not impose unnecessary burdens on lawful activity.'" (internal citations omitted)).

## II.   THE CITIBANK INJUNCTION IMPROPERLY RESTRAINS PAYMENTS TO BE MADE WHOLLY WITHIN ARGENTINA

The Argentine Law Bonds are issued in Argentina, subject to Argentine law, and payable by the Republic wholly within Argentina.  Even the District Court has previously recognized that such payments cannot be subjected to restraint by a New York court.  While the restraint here is accomplished by way of injunctive relief against the Republic, rather than attachment or execution, the effect is identical as to Citibank Argentina and its customers—Citibank Argentina is directed by the Citibank Injunction to restrain customer property located in

27

Argentina in which the Republic has no interest, and to which Appellees have no claim or right.

### A.   The Argentine Law Bonds Are Entirely Different from the Exchange Bonds that Were the Subject of the Injunctions

As an initial matter, the Argentine Law Bonds are entirely different from the Exchange Bonds that were the subject of the prior proceedings before the District Court that led to the issuance of the Injunctions. In its opinion issued in connection with the Injunctions, the District Court described the bonds—and the relevant payment process—targeted by the Injunctions:

> The process and the parties involved in making payments on the Exchange Bonds are as follows. Argentina transfers funds to the Bank of New York Mellon ("BNY"), which is the indenture trustee in a Trust Indenture of 2005. Presumably there is a similar indenture for the 2010 exchange offer. BNY then forwards the funds to the "registered owner" of the Exchange Bonds. There are two registered owners for the 2005 and 2010 Exchange Bonds. One is Cede & Co. and the other is the Bank of New York Depositary ("BNY Depositary"). Cede and BNY Depositary transfer the funds to a "clearing system" such as the Depository Trust Company ("DTC"). The funds are then deposited into financial institutions, apparently banks, which then transfer the funds to their customers who are the beneficial interest holders of the bonds.

(A-1450).

The Argentine Law Bonds are thus materially different from the Exchange Bonds described in the Opinion: the Argentine Law Bonds were issued under Argentine decrees, not the Indenture governing the other Exchange Bonds;

28

payment to Citibank Argentina is made wholly within Argentina through local entities (the CRYL and the Caja), not through BNY Mellon; no U.S. depository is involved; and the bonds do not provide for any submission to U.S. jurisdiction. Finally, the majority of the Argentine Law Bonds were not issued as part of any exchange offer.  *See* Boccuzzi Letter (A-2181); *see also* Letter from Karen E. Wagner, dated July 28, 2014 (A-2187–89).

Under these circumstances, the Citibank Injunction, which extends the Injunctions to restrain payment on the Argentine Law Bonds—despite the fact that they had not been considered by the District Court when it issued the Injunctions and the District Court conducted no real fact-finding to support this extension—is entirely unjustified, especially where it restrains payments on bonds that the District Court itself has said should not be restrained.  *See* Citibank Injunction (SPA-4) (restraining payment only on "exchange bonds" and directing the parties "to devise a way to distinguish between" Argentine Law Bonds that are Exchange Bonds and those that are not).

### B.    The Funds Being Restrained Are Not Owned by the Republic

In an earlier decision, *EM Ltd. v. Republic of Argentina*, the District Court ruled that payments made in Argentina and received for the account of Citibank Argentina's customers were not subject to restraint as property of the Republic. The District Court had initially granted an *ex parte* application for an order

29

restraining payments in respect of certain "BODEN 12" bonds issued by the Republic. 865 F. Supp. 2d at 416–17. Citibank moved to vacate the restraints to the extent they prevented Citibank Argentina from making payments of interest to its customers holding such bonds. *Id.* at 417.

In its opinion vacating the *ex parte* restraint, the District Court described in detail the flow of funds for payments on the bonds, which was the same as it is for the Argentine Law Bonds. There, as here, the Republic transferred funds in Argentina to the CRYL, the CRYL then transferred the funds to the Caja, and the Caja in turn credited accounts of Citibank Argentina as custodian for its bondholder customers. *Id.* at 419. There, as here, "[t]he Republic lost control over the funds when it made payment to CRYL," *id.* at 423, and "had no further interest in the funds designated to pay the BODEN 12 bonds once it transferred those funds to CRYL," *id.* at 424.

The District Court relied in part upon *Brown v. J.P. Morgan & Co.*, 40 N.Y.S.2d 229, 233 (1st Dep't 1943), *aff'd*, 295 N.Y. 867 (1946), to vacate the restraining orders preventing Citibank Argentina from making the payments in question. In *Brown*, the court had vacated an order of attachment of funds held by a New York bank in an account for bondholders because the issuing company "[had] lost all control over this fund" when it transferred it to the bank for distribution to the bondholders; in *EM Ltd.*, the District Court found that the

30

Republic had similarly lost all interest in the funds at issue when it deposited them for distribution to bondholders. *EM Ltd.*, 865 F. Supp. 2d at 423 (quoting *Brown*, 40 N.Y.S.2d at 233).

In this case, although the Republic is enjoined from making payments on Exchange Bonds if it does not pay Appellees, it will nevertheless surely once again violate the Injunctions and make the payments. With respect to the Argentine Law Bonds, the Republic will initiate payments to the CRYL, which will pay the Caja. The Caja will then pay Citibank Argentina. Under applicable law, the funds will become the property of the bondholders as soon as they reach the CRYL. There is therefore no legal basis upon which Citibank Argentina can restrain these customer funds.

## C.     The Funds Being Restrained Are Not in the United States

Under the FSIA, funds of the Republic that are not used for a commercial purpose in the United States are immune from restraint. *See* 28 U.S.C. § 1610(a). Here, even if the Republic had a continuing interest in the funds held by Citibank Argentina for its customers—which it indisputably does not—the funds are not in the United States, nor are they "persons, or interests in things, present within its territory"—another fact that precludes the restraint imposed by the Citibank Injunction. Restatement (Third) Foreign Relations Law of the United States § 402(1)(b) (1987). In *ANSES*, the District Court recognized that it could

31

not restrain property the *situs* of which was in Argentina, 2010 WL 768874, at * 2, and further found the separate entity rule instructive in determining that property held by the Argentine branch of a U.S. bank did not have a U.S. *situs*, *id.* at * 3.

In the litigation leading to the *ANSES* decision, the District Court initially issued restraining orders and orders of execution directed to securities custody accounts held at Citibank Argentina by ANSES, the Argentine agency responsible for making payments to Argentine pensioners. *Id.* at *1. Citibank moved to vacate the restraints, on the grounds that they could not reach customer assets in custody accounts located in Argentina, even if the securities held in the accounts were property of the Republic.

The District Court recognized that, under the FSIA, sovereign assets could be subject to attachment or execution only where they constituted "'property in the United States of a foreign state . . . used for a commercial activity in the United States.'" *Id.* at *2 (quoting 28 U.S.C. § 1610(a)). After rejecting plaintiffs' argument that "there is one Citibank, the company headquartered in the United States, not multiple Citibanks," and its corollary that "the situs of the intangible property [on deposit with Citibank Argentina] is the United States," *id.* at *2, the Court concluded that the ANSES assets were unquestionably located in Argentina, not in the United States:

32

All the dealings of ANSES in setting up the accounts, depositing securities into the accounts (whether electronically or by paper), giving instructions to Citibank regarding the accounts, receiving advice regarding the accounts, directing the sale and purchase of securities—all were made between ANSES and the Citibank branch in Argentina.  Although the property is properly regarded as intangible property, there were and still are actual live transactions regarding that property, all of which have taken place, and are taking place, in Argentina.  As far as the use of the assets for whatever activity they are used for, this would surely involve dealings in Argentina by ANSES, and between ANSES and the Citibank branch there.

Thus, the court concludes that the property in question is not located in the United States.  The court further concludes that, even if the property is being used for commercial activity, this use is not occurring in the United States.  Thus the assets in the custodial accounts are immune from attachment, restraint and execution.

*Id.* at *4.

Thus, while Citibank "is, through its branches, located in many countries," *id.* at *2, the District Court ruled that it is not the case that "intangible property, resulting from deposit transactions between ANSES and the Buenos Aires branch of Citibank, can be considered as 'property in the United States' and 'property . . . used for a commercial activity in the United States.'"  *Id.* at *4 (quoting 28 U.S.C. §§ 1610(a) and (d)).

Despite the District Court's acknowledgement that the *ex parte* orders it had issued were of "doubtful" validity, Hr'g Tr. at 26:17–18, *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715 (TPG) (S.D.N.Y. Mar. 1, 2010) (Docket No. 336), the restraints were continued pending appeal, exposing

33

Citibank Argentina and its officers to imminent civil, regulatory, and criminal risk in Argentina.

Citibank filed an expedited appeal from the stay of the District Court's decision vacating the orders, and an emergency motion to vacate the stay on the grounds, among others, that the restraining orders would not be recognized in Argentina.  This Court quickly vacated the stay because "the district court did not find, nor will the record support, a likelihood that [the plaintiffs] will succeed on the merits of a claim that the custodial accounts at issue are being used for commercial activity in the United States."  *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 10-837-cv (L), slip op. at 2 (2d Cir. Mar. 24, 2010). For the very same reasons, the payments on the Argentine Law Bonds here cannot be restrained because they are made wholly within Argentina.

### D.    Citibank Argentina Is Entitled to the Protection of the Separate Entity Rule

Citibank Argentina is also entitled under the separate entity doctrine to protection from an order requiring it to violate the laws and directives of the country in which it operates.  Under the separate entity rule, the *situs* of property held by a branch bank is at the branch, and that property is subject to the laws of the jurisdiction where the branch is located.  "Under this rule each branch of a bank is a separate entity-that is, separate from the head office and separate from

other branches." *ANSES*, 2010 WL 768874, at *3.[7]  The separate entity doctrine is

a rule "unique to international banks" reflecting "policy considerations [that]

contemplate, among other issues, the intolerable burden that would otherwise be

placed on banking and commerce if mere service of a writ to a New York branch

could subject foreign bank branches to competing claims."  *Shaheen Sports, Inc. v.*

*Asia Ins. Co.*, No. 98 Civ. 5951, 2012 WL 919664, at *3, *5 (S.D.N.Y. Mar. 14,

2012) (internal quotation marks omitted).

To protect foreign branches of international banks against conflicting duties

under domestic and foreign laws, the separate entity doctrine places deposits held

in a foreign branch of a U.S. bank beyond the reach of a New York execution

order.  "[E]ach branch of a bank is a separate entity, in no way concerned with

accounts maintained by depositors in other [branches] or at the home office."

*Cronan v. Schilling*, 100 N.Y.S.2d 474, 476 (Sup. Ct. N.Y. Cnty. 1950), *aff'd*, 126

N.Y.S.2d 192 (1st Dep't 1953); *see also Det Bergenske Dampskibsselskab v. Sabre*

---

[7] In *Pan-American Bank & Trust Co. v. National City Bank of New York*, 6
F.2d 762, 766–67 (2d Cir. 1925), this Court held that 12 U.S.C. § 601, which
authorizes national banks to establish foreign branches, requires that a parent bank
and its foreign branches be considered as separate entities in connection with their
respective rights and obligations under a letter of credit issued by the parent bank
and negotiated by one of its foreign branch offices.  This principle has been
codified in Article 5 of the NYUCC as it relates to interbranch letters of credit,
NYUCC § 5-116(b), and in Article 4-A of the NYUCC as it relates to interbranch
wire transfers, NYUCC § 4-A-105(1)(b).  *See also Shaheen Sports*, 2012 WL
919664, at *3.

*Shipping Corp.*, 341 F.2d 50, 53 (2d Cir. 1965); *John Wiley & Sons, Inc. v.*

*Kirtsaeng*, No. 08 Civ. 7834, 2009 WL 3003242, at *3 (S.D.N.Y. Sept. 15, 2009).

For example, in *Fidelity Partners, Inc. v. Philippine Export and Foreign*

*Loan Guarantee Corp.*, cited by the District Court in the *ANSES* case, Fidelity

moved for an order of attachment and execution against funds transferred to an

account in Manila belonging to the judgment debtor, a Philippine government

agency.  921 F. Supp. 1113, 1115–16 (S.D.N.Y. 1996).  The court concluded that

Fidelity could not attempt to execute against assets held in a Manila office by

moving against the bank's New York branch because "the New York branch and

the Manila office should be viewed as separate entities for the purposes of

attachment and execution."  *Id*. at 1119.  The court held that Fidelity could not

reach funds by serving a U.S. entity when the funds themselves were "on the

opposite end of the globe and in another sovereign nation."  *Id*. at 1120.

Similarly, in *Fidelity Partners, Inc. v. First Trust Co. of New York*, 58 F.

Supp. 2d 52 (S.D.N.Y. 1997), a sovereign judgment debtor maintained a securities

account on the books of the Manila branch of an international bank.[8]  The district

---

[8] Article 8 of the NYUCC provides that a creditor may reach a debtor's interest in a security entitlement "only by legal process upon the securities intermediary with whom the debtor's securities account is maintained," NYUCC § 8-112(c), and establishes the jurisdiction of the securities intermediary pursuant to NYUCC § 8-110(e).  NYUCC § 9-304, in turn, establishes a debt *situs* rule for bank deposits that localizes a security interest to one specific jurisdiction.  *See also*

court held that the property was not subject to turnover pursuant to CPLR § 5225 or § 5227 based on the court's jurisdiction over the New York branch that operated the clearing system through which the securities were held. *See* 58 F. Supp. 2d at 54–55.[9]

The separate entity doctrine remains vital.[10] For example, in *Shaheen Sports*, the district court refused to permit execution upon deposits held at a Pakistani branch based upon service effected in New York. *See* 2012 WL 919664, at *3. Similarly, in *Ayyash v. Koleilat*, 957 N.Y.S.2d 574 (Sup. Ct. N.Y. Cnty. 2012), a state court refused to permit judgment creditors to subpoena information

---

The Hague Convention on the Law Applicable to Certain Rights in Respect of Securities Held With an Intermediary, Article 4, *available at* http://www.hcch.net/index_en.php?act=conventions.text&cid=72.

[9] On appeal, this Court remanded for a limited consideration of mootness. *See* 142 F.3d 560, 566 (2d Cir. 1998). On remand, the district court adhered to its prior decision, *see* 58 F. Supp. 2d 55, 61–62 (S.D.N.Y. 1999), but also found that the case was, in fact, moot, *see id.* at 59–60, *aff'd*, 216 F.3d 1072 (2d Cir. 2000) (Table).

[10] This Court, in *Tire Engineering and Distribution L.L.C. v. Bank of China Ltd.*, 740 F.3d 108, at 117–18 (2d Cir. 2014), certified two questions to the New York Court of Appeals, one of which was later withdrawn, relating to the application of the separate entity rule in post-judgment enforcement proceedings under *Koehler v. Bank of Bermuda,* 12 N.Y.3d 533 (2009). The remaining question, which is still being briefed before the New York Court of Appeals, and is scheduled for argument on September 16, 2014 (CTQ-2014-00001), is "whether the separate entity rule precludes a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a debtor's assets held in foreign branches of the bank."

from foreign banks by serving the subpoenas on their New York branches, observing that "[t]he importance of the separate entity rule is underlined by the existence of laws in the foreign jurisdictions in which the institutions are headquartered or in which other of their branches are located, laws providing for serious civil and criminal sanctions in the event of their breach." *Id.* at 581, *aff'd*, 981 N.Y.S.2d 536 (1st Dep't 2014).

The separate entity doctrine has also been codified to protect a branch that is subject to the *de facto* authority of a local sovereign. Section 138(1) of the New York Banking Law provides that a New York bank is liable for its branch's contracts only to the extent that a local bank would be liable under local law, and expressly provides that:

> The laws of such foreign country for the purpose of this section shall be deemed to include all acts, decrees, regulations and orders promulgated or enforced by a dominant authority asserting governmental, military or police power of any kind at the place where any such branch office is located[.][11]

---

[11] Section 138, which was enacted to protect New York banks from conflicting cross-border laws and adjudications such as those now confronted by Citibank and Citibank Argentina, was amended in 1994 for the express purpose of overturning the decisions in *Trinh v. Citibank, N.A.*, 850 F.2d 1164 (6th Cir. 1988) (holding Citibank New York liable for deposits placed with its expropriated Saigon branch), and *Wells Fargo Asia, Ltd., v. Citibank, N.A.*, 936 F.2d 723 (2d Cir. 1991) (holding Citibank New York liable for Eurodollar deposits placed with Manila branch embargoed by debt moratorium). *See* Letter from N.Y. State Sen. Hugh T. Farley to Elizabeth D. Moore, Legislative Sec'y to Gov. Mario Cuomo, at 1-2 (July 1, 1994) (explaining that "[t]hese two court decisions were surprising because they

A federal analog to Section 138 provides with respect to foreign branch deposits that a bank head office in the United States "shall not be required to repay any deposit made at a foreign branch of the bank if the branch cannot repay the deposit due to . . . (2) an action by a foreign government or instrumentality (whether de jure or de facto) in the country in which the branch is located; unless the [head office] has expressly agreed in writing to repay the deposit under those circumstances."  12 U.S.C. § 633.

While most of the cases that arise under the separate entity doctrine involve efforts to attach or execute against property held offshore, the principles that animate the doctrine apply here *a fortiori* because the property being restrained offshore does not even belong to the judgment debtor.

Here, Citibank Argentina is subject to the local laws of its home jurisdiction, Argentina, including the acts of its dominant authorities—who have demanded that Citibank Argentina make payments to its customers when the Republic pays on the

---

went *against* current U.S. policy, N.Y. policy, traditional banking practices and the recommendations of federal bank regulatory agencies" and "[t]his bill should help U.S. banks be competitive with foreign banks" who "are not being held liable for losses that occur in their foreign branches because of political risk"), *in* 1994 NYLS' Governor's Bill Jacket, ch. 264.  Pursuant to Section 138, the liability or responsibility of the New York office of a bank for actions taken or omitted by its Argentina branch would thus be determined solely by reference to rights and obligations of a wholly local Argentine bank under the laws of Argentina.

Argentine Law Bonds.[12]  Therefore, the separate entity rule, various statutes, and fundamental principles of law and equity require that the Citibank Injunction be reversed and the Citibank Clarification Order be reinstated.

## III. PRINCIPLES OF COMITY THAT SUPPORT THE ACT OF STATE DOCTRINE PRECLUDE APPLICATION OF THE CITIBANK INJUNCTION TO PAYMENTS MADE WITHIN ARGENTINA

The Republic completes payments on the Argentine Law Bonds entirely within Argentina.  Therefore, the act of state doctrine and the related defense of "foreign sovereign compulsion," also preclude any injunction prohibiting Citibank Argentina from making payments to customers of funds held in custody for them in Argentina.

The act of state doctrine has its origins in principles of comity and respect for other states.[13]  *See Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116,

---

[12] Officials of the Republic with authority over Citibank Argentina have made plain their view that compliance with the Citibank Injunction would violate Argentine law, demanding that Citibank Argentina "continue acting in favor and for the protection of the Holders of Argentine [Law] Bonds," and that a failure to do so because of the Injunctions would violate Argentine law and "impair[] Argentine public order."  *See* Supp. Auth. Letter (Ex. B) (A-2209).  When a foreign government official having "power to interpret existing [foreign] law" provides an interpretation of foreign law to an American court, the resulting "official declaration is conclusive so far as the intended . . . effect of [that law] is concerned."  *United States v. Pink*, 315 U.S. 203, 220 (1942); *see also Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) ("[A] foreign sovereign's views regarding its own laws merit—although they do not command—some degree of deference.").

40

136 (1812) ("The jurisdiction of the nation within its own territory is necessarily

exclusive and absolute.  It is susceptible of no limitation not imposed by itself . . . .

All exceptions, therefore, to the full and complete power of a nation within its own

territories, must be traced up to the consent of the nation itself.").  As formulated

by the Supreme Court:

> Every sovereign State is bound to respect the independence of every
> other sovereign State, and the courts of one country will not sit in
> judgment on the acts of the government of another done within its
> own territory.  Redress of grievances by reason of such acts must be
> obtained through the means open to be availed of by sovereign powers
> as between themselves.

*Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).

The doctrine "has its roots, not in the Constitution, but in the notion of

comity between independent sovereigns."  *First Nat'l City Bank v. Banco Nacional*

*de Cuba*, 406 U.S. 759, 765 (1972).  The act of state doctrine "requires that, in the

process of deciding [cases and controversies], the acts of foreign sovereigns taken

within their own jurisdictions shall be deemed valid."  *W.S. Kirkpatrick & Co. v.*

*Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  "The potential for affront

may be particularly acute where the district court issues an injunctive order . . . that

---

[13] In *United States v. Javino*, 960 F.2d 1137, 1142–43 (2d Cir. 1992), this
Court endorsed the approach to comity analysis summarized in the Restatement
(Third) of Foreign Relations Law §§ 402–03 (1987), which directs courts to
consider factors such as the "link" to the regulating state and the possibility of
"conflict" with regulations in other states.  *See* Restatement § 403(2)(a), (h).

41

purports to control the foreign state's conduct within its own borders."  Brief of the United States as Amicus Curiae at 12–13, *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006) (No. 05-51168) (invalidating a turnover order entered by the district court against the Congo and vacating contempt order on the grounds that both were barred by the FSIA).

In *Allied Bank International v. Banco Credito Agricola de Cartago*, 566 F. Supp. 1440 (S.D.N.Y. 1983), *aff'd*, 733 F.2d 23 (2d Cir. 1984), *rev'd on reh'g*, 757 F.2d 516 (2d Cir. 1985), the district court held that because a Costa Rican suspension of U.S. Dollar debt payments was "public in nature, rather than commercial" and "in response to a serious national economic crisis," 566 F. Supp. at 1443, the act of state doctrine required that the district court give effect in New York to the Costa Rican moratorium.  This Court initially affirmed, but then reversed on rehearing and held that, because the *situs* of the debt—its place of payment—was New York for act of state purposes, the Costa Rican decree would not be given effect outside Costa Rica to prevent payment.  757 F.2d at 521.  This Court's decision in *Allied Bank* plainly supports the converse proposition:  where a sovereign act such as the payment of its debt occurs solely within the sovereign's

borders, the act of state doctrine will bar the review or enjoinder of the act by courts of the United States.[14]  *See id.*

Relatedly, courts have also recognized a defense of "foreign sovereign compulsion":

> The defense of foreign sovereign compulsion . . . focuses on the plight of a defendant who is subject to conflicting legal obligations under two sovereign states.    Rather than being concerned with the diplomatic implications of condemning another country's official acts, the foreign sovereign compulsion doctrine recognizes that a defendant trying to do business under conflicting legal regimes may be caught between the proverbial rock and a hard place where compliance with one country's laws results in violation of another's.

*In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 551 (E.D.N.Y. 2008).[15]

The logic underlying this defense is that "[c]ommerce may exist at the will of the government, and to impose liability for obedience to that will would eliminate for many companies the ability to transact business in foreign lands."

---

[14] At the outset of litigation over the Republic's restructured debt, the District Court applied *Allied Bank* to hold that the Republic could not raise a valid act of state defense with regard to payments to be made *outside* of Argentina. *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003).  Here, however, the payments are made entirely *inside* Argentina.  Under *Allied Bank*, it is plain that restraining payments in Argentina on the Argentine Law Bonds would violate the act of state doctrine.

[15] *In re Vitamin C Antitrust Litigation* is currently pending before this Court. *See* No. 13-4791-cv.  The defendants-appellants are challenging the district court's failure to grant their motion for judgment as a matter of law, following a jury verdict holding them liable under antitrust laws for conduct that they claim is required by Chinese law.

*Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D.

Del. 1970).  As described in the Restatement (Third) of the Foreign Relations Law

of the United States:

> In general, a state may not require a person (a) to do an act in another
> state that is prohibited by the law of that state or by the law of the
> state of which he is a national; or (b) to refrain from doing an act in
> another state that is required by the law of that state or by the law of
> the state of which he is a national.

*Id.* § 441(1); *see id.* § 403(2)–(3) (discussing factors to be considered in evaluating

which of two states' conflicting exercises of jurisdiction should prevail, including

where the regulated activity takes place, the connections between the regulating

state and the regulated person, and the nature of the regulation); *see also United

States v. Watchmakers of Switz. Info. Ctr., Inc.*, No. 96-170, 1962 U.S. Dist.

LEXIS 5816, 1963 Trade Cases (CCH) ¶ 70,600, at ¶ 77,456 (S.D.N.Y. Dec. 20,

1962) ("If, of course, the defendants' activities had been required by Swiss law,

this court could indeed do nothing.  An American court would have under such

circumstances no right to condemn the governmental activity of another sovereign

nation."); *Trugman-Nash, Inc. v. N.Z. Dairy Bd.*, 954 F. Supp. 733, 736 (S.D.N.Y.

1997) (where "there is an actual and material conflict between American antitrust

law and New Zealand law in respect of the marketing of dairy export produce[,

t]hat conflict is sufficient to entitle defendants to invoke the doctrines of act of

state, foreign sovereign compulsion, and international comity").  This Court also

has acknowledged the defense's applicability where "the conduct of the appellees has been compelled by the foreign government." *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 453 (2d Cir. 1987).

These principles have led New York courts to refrain from ordering an entity in a foreign jurisdiction to breach the laws of that jurisdiction:

> Under principles of international comity, a New York court should not encroach upon another nation's sovereignty by requiring citizens to take actions within their home country that would contravene their home country's laws. The non-party banks have shown that were this Court to require that they comply with plaintiff's demands, they, their officers and/or employees could be subject to civil or criminal penalties merely for such compliance. Such intrusion into legal frameworks of foreign countries [is] unjustified by the record *sub judice*.

*Ayyash,* 957 N.Y.S.2d at 582–83 (internal citations omitted).

Here, the Republic pays on the Argentine Law Bonds entirely in Argentina. From the perspective of Citibank, therefore, even though the Republic will likely defy the Injunctions—indeed, *because* the Republic will likely defy the Injunctions, and the District Court cannot enforce the Injunctions—the act of state doctrine and the defense of foreign sovereign compulsion must apply to protect Citibank from risk when Citibank Argentina is obligated by Argentine law to make payments in Argentina to holders of the Argentine Law Bonds.

45

## CONCLUSION

For the reasons set forth, the Citibank Injunction should be reversed and the

Citibank Clarification Order reinstated.

Dated:   New York, New York
         August 15, 2014

                        DAVIS POLK & WARDWELL LLP


                    By:   /s/ Karen E. Wagner
                          Karen E. Wagner
                          James L. Kerr
                          Matthew Rowland
                          Lindsey T. Knapp

                          450 Lexington Avenue
                          New York, New York  10017
                          Telephone:   (212) 450-4000
                          Facsimile:   (212) 701-5800

                          *Attorneys for Movant-Interested
                          Party-Appellant Citibank, N.A.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,370 words (based on the Microsoft Word wordcount function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated:  New York, New York         By:  /s/ Karen E. Wagner
       August 15, 2014                    Karen E. Wagner

                                    450 Lexington Avenue
                                    New York, New York 10017
                                    Telephone:   (212) 450-4000
                                    Facsimile:   (212) 701-5800

47